# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00423-CR

**Elizabeth Sanchez Barton, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF LAMPASAS COUNTY, 27TH JUDICIAL DISTRICT
## NO. 7894, HONORABLE WILLIAM BACHUS JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Elizabeth Sanchez Barton was indicted for criminal solicitation, a second-degree felony, to which she pleaded not guilty. *See* Tex. Penal Code Ann. § 15.03 (West 2003). The jury found Barton guilty of the offense, and the trial court assessed punishment of ten years' confinement, probated for ten years. In two points of error, Barton contends that the evidence was legally and factually insufficient to sustain her conviction and that the trial court erred in failing to correctly instruct the jury regarding the requirements for corroboration under section 15.03(b) of the Texas Penal Code. Because we hold that the evidence is factually and legally sufficient to sustain Barton's conviction and that any error in the instructions to the jury regarding corroboration did not result in egregious harm, we affirm the trial court's judgment.

## BACKGROUND

Barton's conviction for criminal solicitation was based on the State's evidence that she paid an undercover Texas Department of Public Safety (DPS) officer to burn down the home of her neighbor, Virgie Wolfe.

Wolfe's residence is located at 1101 Bridge Street, Lampasas, Texas. Barton had previously lived in a house on the same lot, but was forced to vacate 17 years ago as a result of unpaid property taxes. The house Barton had lived in had been torn down, leaving the lot vacant for many years. Wolfe's daughter, Linda McMullin, testified that in November 2005, she purchased the lot for the purpose of building a house for her mother. McMullin further testified that she had mentioned to Barton that she planned to build a house on the lot.

Barton, who had lived in the neighborhood for many years and was 74 years old at the time of trial, was often seen in Wolfe's neighborhood, driving around in a red truck. Barton testified that because she is physically disabled and unable to walk, she needed to drive her truck to get to the various places in the neighborhood where she routinely fed cats. The evidence suggests that Barton was living in her truck at the time of her arrest, but had an arrangement with Jose Deanda,[1] allowing her to use his house on Bridge Street to take showers.[2] At some point after the arrest, Barton moved into Deanda's house, but was no longer living there at the time of trial. Deanda's house was located down the street from Wolfe's house, with only a vacant lot separating the two residences.

---

[1] The reporter's record indicates that "Deanda" is a phonetic spelling.

[2] Deanda rented a house on Bridge Street from Rocky Wolfe, Virgie Wolfe's grandson.

Wolfe's grandson Rocky testified that he had seen Barton driving past Wolfe's house and parking her truck so that she could see into the back of the house for extended periods of time. He further testified that when he discussed the lot at 1101 Bridge Street with Barton, she expressed to him that "she felt like the City took that lot from her because of the due taxes, and that she didn't feel anybody should have that lot because that was basically her mother's." Brandy Brice, Rocky's fiancé, testified that she had seen Barton's truck parked near Wolfe's house two or three times and that on one occasion, she had observed Barton "tossing something over the fence" onto Wolfe's property. McMullin also testified that she had seen Barton looking through the windows of Wolfe's house and driving in a vacant lot behind the house, which was fenced in on three sides and not usable as a thoroughfare.

James Rowan, a volunteer firefighter in Lampasas, testified that in April 2006, Barton drove up to him while he was working outside of his residence and asked him if he would burn down her house for $300. She claimed that she wanted to collect the insurance money on the house, which she identified by describing Wolfe's house. Rowan further testified that after he refused this offer, Barton told him that she knew someone who would do the job for $50. Approximately two weeks later, Rowan took this information to the Lampasas Fire Marshal, Reece Oestreich.

At Oestreich's request, Rowan gave an official statement recounting his conversation with Barton to Sammy Bailey, the assistant chief of police in Lampasas. As a result of Rowan's statement, an undercover operation was arranged in which Rickye Feist of the DPS Special Crimes Unit was to serve as the undercover officer. On the morning of May 10, 2006, Barton, Rowan, and Feist held a meeting at Barton's truck, which was parked in an open field near Wolfe's

3

neighborhood. An audio recording of this meeting was played in the presence of the jury. Rowan introduced Feist to Barton as his cousin and asked Barton if she remembered asking him to burn down the house. When Barton responded affirmatively, Feist explained that he was willing to do the job. Barton asked him how much the job would cost and verified that he knew which house she wanted to burn down. Feist told Barton that he would do the job for $100, but that he would need to get some money up front. Barton stated that she needed to get money from the bank and requested that they meet again that day so that she could give the money to Feist.

Later that same day, Barton, Rowan, and Feist held a second meeting at Barton's truck, which was parked on Bridge Street. Audio and video recordings of the second meeting were played for the jury. Barton asked Feist a number of times if he was really going to burn the house down and again indicated that she wanted to be present, but Feist told her that he worked alone. Feist asked Barton if she had a gas can that he could use for the job, but she answered that she did not. Barton then delivered $50 to Feist for the purpose of burning down Wolfe's house, stating that she would meet him the next morning at the same location to pay him another $50 if he completed the job. Rowan and Feist both testified that the amount of cash Barton handed to Feist was $50. When the money exchanged hands, Feist signaled to the officers standing by, who then arrested Barton for criminal solicitation. Bailey testified that after the arrest was made, Feist turned the $50 in cash over to her as evidence.

Barton took the stand and testified that Rowan "is a liar," and that she had never been to his residence or asked him to burn down a house. She testified that Rowan initially approached her to discuss a pickup truck that he was interested in stealing. Rowan testified that he did have a

4

conversation with Barton involving a truck at one time, but he insisted that he was merely interested in "taking" the truck. It is not clear from Rowan's testimony what he meant by "taking" the truck, as he stated that he was "going to look for the owner first," and later testified that he "wasn't planning on taking it," but was only "looking at it." According to Rowan, Barton suggested that he steal the truck and split the money with her, an offer which he refused.

Barton also testified that during her conversation with Rowan about the truck, he propositioned her sexually and gave her $20, which she presumed was intended to be in exchange for sex. Rowan denied these events in his testimony.

Barton further testified that on the day of her arrest, she met with Rowan and a man that Rowan introduced as his cousin, and that Rowan "said something, me want to burn the house. And I didn't—I didn't—I don't know why he said that, but I did hand him his $20 that I owed him for the cart." There is no other mention of a cart in any other evidence or testimony. Barton testified that she never gave Feist $50, and that the only cash that exchanged hands at the meeting was Rowan's $20. In other testimony, Barton stated that she returned Rowan's $20 because she believed he was angry at her for not performing sexual acts in exchange for the money. She testified that before the day of her arrest, Rowan had come to see her "when he was real mad and he was cussing," and asked for his $20 back. Barton testified that she had told him she would go to the bank and get his money, and that it was this money that she returned to him on the day of her arrest.

Barton denied asking Feist or Rowan to burn down Wolfe's house or meeting with Feist and Rowan a second time on the day of her arrest. When asked about the recording of her second meeting with Feist and Rowan, Barton stated, "I would call that a liar because there is a lot of ways the law can fix things up to blame anybody."

5

When asked about the testimony that she had been parking near Wolfe's house and looking in the windows, Barton testified that she only parked in the area to feed cats under a nearby shade tree, stating, "I have been parking there ever since 1980, even when I lived there in my house."

After 35 minutes of deliberation, the jury found Barton guilty of criminal solicitation. Barton's motion for new trial was overruled by operation of law, and this appeal followed.

### STANDARD OF REVIEW

In reviewing the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the verdict. *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999).

In determining factual sufficiency, we must weigh all the evidence in a neutral light and may set the finding aside only if the evidence is so weak that the verdict seems clearly wrong or manifestly unjust, or the verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). An appellate court must be appropriately deferential to the jury's verdict, in order to avoid substituting its own judgment for that of the factfinder. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony. *Id*. A factual sufficiency review must include an examination of the most important and relevant evidence

6

that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

The standard of review for jury-charge error depends on whether a timely objection was made in the trial court. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). If error in a jury charge was the subject of a timely objection, reversal is required if the error is calculated to injure the rights of the defendant. *Id.* If no proper objection was made at trial, reversal is only proper in the presence of egregious harm. *Id.*

## DISCUSSION

*Sufficiency of the Evidence*

Barton asserts that the evidence at trial was both legally and factually insufficient to convict her of the offense of criminal solicitation. The evidence introduced at trial included a photograph and an audio recording of Barton's first meeting with Rowan and Feist, in which she negotiated a price for having Feist burn down Wolfe's home and asked for time to go to a bank and retrieve the necessary funds for payment. The evidence also included both a video and an audio recording of Barton's second meeting with Rowan and Feist—a meeting which she claimed did not take place—in which Barton asked Feist several times if he would burn down the house, offered to help him complete the job, and agreed to meet him at the scene the next morning to pay him the rest of the money once the job was finished. The evidence also included Rowan's testimony regarding Barton's offer to pay him $300 to burn down a house, Feist's testimony regarding Barton's comments during the two meetings in which he served as an undercover officer, and the testimony

7

of Rocky, Brice, and McMullin, each of whom testified that they had seen Barton acting suspiciously around Wolfe's house prior to her arrest.

The evidence in Barton's favor consists of her own testimony that she did not meet with Rowan and Feist a second time on the day of the arrest, that she never offered to pay Rowan or Feist to burn down a house, and that the money that exchanged hands at her meeting with Rowan and Feist was actually the return of $20 to Rowan that she believed he had given her in exchange for sex. Barton also attempted to discredit Rowan's statements by testifying that she had previously had a conversation with Rowan about a truck that he intended to steal. Barton also explained the testimony that she had frequently been seen parked near Wolfe's house by testifying that she was merely parking there to feed cats, as she had done for many years.

Barton's testimony conflicts with the audio and video recordings presented at trial, as well as the testimony of Feist, Rowan, and Bailey. In a legal-sufficiency review, we view the evidence in the light most favorable to the verdict and assume that the jury resolved evidentiary conflicts in favor of the prevailing party. *Swearingen*, 101 S.W.3d at 95. Therefore, we must assume that the jury resolved the conflicts between Barton's testimony and the remainder of the evidence by choosing not to believe Barton's testimony. As a result, we hold that the evidence at trial was legally sufficient to find Barton guilty of the offense of criminal solicitation.

In a factual-sufficiency review, we view the evidence in a neutral light to determine whether the evidence is so weak that the verdict seems clearly wrong or manifestly unjust, or the verdict is against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15. Viewing the evidence in a neutral light, including the audio and video recordings of Barton's

meetings with Feist and Rowan, as well as the testimony of Feist, Rowan, Bailey, Rocky, Brice, and McMullin, we determine that the evidence was not so weak that the verdict seems clearly wrong or manifestly unjust. Furthermore, the great weight and preponderance of the evidence supports the guilty verdict, as the only evidence in Barton's favor consists of her own self-serving testimony. *See Bustamante v. State*, 106 S.W.3d 738, 741 (Tex. Crim. App. 2003) (holding that jury is free to disbelieve defendant's self-serving testimony in light of contradictory evidence). As a result, we hold that the evidence is factually sufficient to support the jury's finding that Barton was guilty of criminal solicitation. Barton's first issue is overruled.

*Jury-Charge Error*

In Barton's second issue on appeal, she contends that the trial court erred in failing to correctly instruct the jury regarding the requirements for corroboration under section 15.03(b) of the penal code. *See* Tex. Penal Code Ann. § 15.03(b). Section 15.03(b) states, "A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation." Barton argues in her brief on appeal that "there was no corroboration instruction included in the Court's charge."

A reading of the jury charge used in Barton's case reveals that paragraph two consists of the following language: "A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the person act on the

9

solicitation." This instruction is practically identical to the statutory language of section 15.03(b). *See id*. § 15.03(b).

While the corroboration instruction in this case tracks the language of section 15.03(b), it does not include an application paragraph such as the following:

> Now, therefore, even if you believe from the evidence beyond a reasonable doubt that the defendant did commit the offense of criminal solicitation as alleged in the indictment, in order to convict the defendant you must further believe beyond a reasonable doubt that the testimony of C.D. [*person solicited*] is corroborated . . . and that the solicitation was made under circumstances strongly corroborative of both the solicitation itself and the defendant's intent that the other person act on the solicitation, but if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

8 Michael J. McCormick, et al., *Texas Practice: Criminal Forms and Trial Manual* § 111.3 (11th ed. 2005). Texas courts have expressed approval of corroboration instructions that contain such an application paragraph. *See Bell v. State*, 768 S.W.2d 790, 799-800 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd); *Varvaro v. State*, 772 S.W.2d 140, 143 (Tex. App.—Tyler 1988, pet. ref'd) (holding that "[t]hese instructions are eminently correct, and provide [appellant] the full measure of protection mandated by section 15.03(b)"). While it is not clear that the omission of an application paragraph on corroboration necessarily constitutes error, the State's brief on appeal concedes that "[t]he jury charge in this case failed to instruct the jury that the law requires corroboration of testimony of the person solicited as to the solicitation itself and Appellant's intent that Feist act on her solicitation."

Because Barton did not object to the jury charge at trial, reversal for charge error is only proper in the presence of egregious harm. *Almanza*, 686 S.W.2d at 171. Under the egregious-harm standard, the omission of a proper corroboration instruction is generally harmless unless the

corroborating evidence is so unconvincing as to render the State's case for conviction significantly less persuasive. *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). The corroborating evidence in this case included audio and video recordings of Barton's meetings with Feist and Rowan, in which she negotiated a price and questioned Feist about whether he would really burn down the house. Assuming without deciding that it was error for the trial court to omit an application paragraph regarding corroboration in the absence of a request, we conclude that, in light of the strength of the corroborating evidence, no egregious harm resulted. Furthermore, this Court has held that in the absence of a request or objection, a trial court's charge that sets forth the law but fails to directly apply the law to the facts does not constitute egregious harm. *See Greene v. State*, 240 S.W.3d 7, 15-16 (Tex. App.—Austin 2007, pet. ref'd). Barton's second issue is overruled.

## CONCLUSION

Because we have determined that the evidence was both legally and factually sufficient to convict Barton of the offense of criminal solicitation, and because any error in the corroboration instruction of the jury charge did not result in egregious harm, the trial court's judgment is affirmed.

_____

Diane Henson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: April 23, 2008

Do Not Publish